**Michael Angelo MORALES, Petitioner–Appellant,**

v.

**Jeanne S. WOODFORD, as Warden of San Quentin State Prison, Respondent–Appellee.**

**No. 99–99020.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 13, 2001.

Filed July 28, 2003.

David A. Senior, McBreen & Senior, Los Angeles, CA, for the appellant.

Keith H. Borjon, Supervising Deputy Attorney General, Los Angeles, CA, for the appellee.

Before: FERNANDEZ, KLEINFELD, and McKEOWN, Circuit Judges.

## OPINION

KLEINFELD, Circuit Judge.

Michael Morales, a state prisoner convicted of murder with special circumstances and sentenced to death, appeals the district court's denial of his petition for a writ of habeas corpus.

### Facts

A. The Murder and Investigation

Seventeen year-old Terri Winchell disappeared on a Thursday evening, January

8, 1981. Her mother lay sick in bed. Terri was getting ready to go out to pick up some food at a local restaurant. Before she left, she got a telephone call around 5:15 p.m. from Rick Ortega, a young man she knew through her friends. She spoke with him, then called her best friend Glenda Chavez. Terri told Glenda Chavez that Rick Ortega had asked her to go with him to the mall to pick out a present for his new girlfriend. Driving her mother's car, she left to pick up the food, telling her mother she "would be right back" and would be "back within the hour." Hours passed. Terri's mother became increasingly worried. She called the police to report that her car was missing around 10:00 that night, and reported that Terri was missing at 8:00 a.m. the next morning.

That day, Friday, the police interviewed Terri Winchell's mother, Terri's best friend Glenda Chavez, and Terri's friend Christine Salaices. They also interviewed Terri Winchell's boyfriend Randy Blythe.

The interviews led the police to Rick Ortega, whom they interviewed at a police station Friday night. Ortega gave the police permission to search his house and car, and they did, starting just before midnight Friday night. They found Ortega's shoes, which were wet, and noted that the tires and undercarriage of his car were also wet. The police found blood splattered all over Ortega's car, which smelled of ammonia. The officers returned to the station house around 1:00 a.m, Saturday morning. Around 2:00 a.m., Ortega led the police to a vineyard on the outskirts of town where they found Terri Winchell's body.

Terri was found naked except for a shirt and bra, which were pulled up over her breasts. She had suffered six blows to the side of her head and seventeen blows to the back of her head. The base of her skull had been shattered. Her skull, cheek bones, and jaw were fractured. She had been stabbed four times in the chest. Her face and body were severely bruised and much of the skin of her front side was torn up. She had multiple wounds on her hands and forearms, typical of a person defending herself.

Michael Morales was Ortega's cousin. He lived in Pat Flores's house. The police came there the next morning, Saturday, with a search warrant. They found a claw hammer, not in a toolbox or tool drawer, but in the vegetable crisper in the refrigerator. Blood was found on the hammer, but there was not enough to get a blood type. They found a kitchen knife with the tip broken off in a kitchen cabinet. In a bedroom, they lifted the mattress off the box spring and found hidden between them a broken belt, which had blood on it consistent with Terri's. A wet towel smelling of ammonia was in a wastebasket. In another bedroom, they found a large kitchen knife on a night stand, and Terri Winchell's purse in the closet.

Morales was arrested and tried and convicted for rape and murder. So was Ortega, but his separate case is not before us.

### B. The Trial

The government tried Morales on three theories of first degree murder—murder with premeditation, murder by torture, and murder by lying-in-wait—and two special circumstances—intentional killing by torture and intentional killing by lying in wait. The prosecution theorized that Rick Ortega wanted to kill Terri Winchell out of jealousy, because Rick's male lover, Randy Blythe, was also Terri Winchell's boyfriend. Also, Terri had embarrassed Ortega by calling him a homosexual to her friends. Ortega recruited his cousin Michael Morales to help him kill her, and Morales agreed out of family loyalty.

Randy Blythe, Terri's boyfriend, testified at Morales's trial that he had indeed

been in sexual relationships with both Rick Ortega and Terri Winchell. His relationship with Rick Ortega came first, though it was not entirely over when he became Terri Winchell's boyfriend.

Rick's former girlfriend Christine Salaices had been a friend of Terri Winchell. Christine testified that Rick Ortega had called her, crying, a few days after Terri and Randy Blythe started dating—ten months before the murder. Rick told Christine that he was crying because he had written Randy Blythe a letter proposing a sexual relationship, but that Randy then began seeing Terri. Christine then dumped Rick Ortega.

Randy Blythe testified that Terri Winchell did not know he was having sex with Rick Ortega, but Rick Ortega knew that he was having sex with Terri. After Randy Blythe began dating Terri, Rick told him that "I wish you wouldn't spend so much time with her." When Randy tried to end his relationship with Rick Ortega, Rick threatened to kill Randy and his family.

Christine Salaices, Rick Ortega's previous girlfriend, testified that five months before the murder, in August 1980, she met Ortega at a restaurant, where Ortega had told her that "he wanted to go to Randy's house and he wanted to ring the doorbell, and he was gonna wait for Randy to come to the door and to open the door. And he was gonna have a knife in his hand and he was gonna repeatedly stab Randy and turn the knife in him to see the expression on his face." Christine testified that Ortega had told her that "his cousin Mikey [Morales] would be with him because Mikey wouldn't let him stop. Mikey would help him and Mikey wouldn't let him stop, that Mikey would be there." According to Christine, Ortega said that "if Terri was there, she was gonna get it, too." Around the same time, Ortega repeatedly asked Christine to help him kill Randy

Blythe. Christine testified that she had told Terri Winchell about Rick Ortega's threats. But, Christine testified, by October 1980, three months before the murder, Rick Ortega "was supposedly feeling better about himself and trying to make amends with everyone that he had said these things to."

Mike Morales's girlfriend was Raquel Cardenas. Raquel testified that she had known Morales for seven months at the time of the murder. She testified that a few months before the murder, Morales told her that his "friend" had "gotten hurt by a girl, and ... that he was feeling close to his best friend since he got hurt by that girl." Morales told her that this girl had "dumped" his friend and because of this "he turned gay."

Glenda Chavez, Terri Winchell's best friend, testified that two weeks before the murder, she spoke with Rick Ortega on the telephone. Rick told her that Terri "was going around saying that he was gay" and that Terri "was gonna pay back for everything she was saying about him." But Rick Ortega called Glenda back a week later and told her "to tell Terri that everything was okay, that he wanted to be friends with her, and that he was gonna come over sometime and talk with her."

Pat Flores lived in the same house where Morales lived. She testified that the day before the murder, while she was sitting in her kitchen, "Mike [Morales] come up from behind me and he threw a belt around my neck and he tightened it up a little bit. . . . And then I ... took it off and I asked him what he was doing. He said he was practicing. I asked him, I said, 'Well, who are you going to do this to?' He goes, 'Never mind.' And I go, 'Do I know him?' He goes, 'No. Neither do I.'"

Around 11:00 in the morning on the day of the murder, Morales's girlfriend Raquel

Cardenas went to Morales's house, where he lived with Flores. Raquel testified that Morales got a phone call at 4:30 p.m. According to Raquel, Morales told her that it was Ortega, and that "Rick was gonna come over later" and "pick up a girl." Raquel testified that Morales said "he was gonna do Rick a favor," that "he was gonna hurt this girl," that "he was gonna strangle her," that "he was gonna use his belt" and "put it around her neck."

Glenda Chavez also testified that Terri called her the afternoon before she was murdered. Terri told Glenda that Rick Ortega had called and asked Terri to come to the mall to help him pick out a present for his new girlfriend.

Raquel Cardenas, Morales's girlfriend, testified that Flores came home to where Morales lived around 5:30 p.m. the afternoon of the murder, and that Rick Ortega showed up around 6:00 p.m. Rick stayed around ten minutes, then left with Flores to go to the store, and came back fifteen minutes later with some wine. Morales drank the whole bottle of wine. Raquel testified that Morales and Ortega left around 6:30 p.m. and someone said that "Rick was supposed to take a girl to the mall." She testified on cross-examination that she didn't see Morales leave with a knife or hammer and didn't see whether he was wearing a belt.

Pat Flores likewise testified that, on the day of the murder, Ortega came to her house around 6:30 p.m. and went out with her to the store, about five minutes away, and came back with wine. Flores testified that after Mike Morales and Rick Ortega left, she noticed her hammer was missing when she looked for it to hang a picture. She also noticed that one of her set of two similar kitchen knives was missing. Flores identified this knife on the witness stand at Morales's trial.

Raquel Cardenas testified that Morales and Ortega came back about an hour later.

Morales put a purse on the table, and "dumped everything out of the purse and started searching it." He showed her Terri's high school identification card. Raquel testified that Morales "threw a belt at [her]" and "told [her] the belt broke."

Pat Flores likewise testified that when Morales came back, he had a broken belt with him. Flores also testified that she saw Morales come in and start water running in the kitchen sink, then go back outside. She noticed spots on Ortega's collar and sleeve, spots that Raquel thought appeared like blood, and testified that Ortega asked her how to get them out. Morales told Flores to look at Ortega's car, and she saw blood on the inside of the door, as did Raquel. Morales's hands "looked like he had blood on 'em."

Pat Flores testified that after Morales had driven Raquel home, he told Flores that "he had put a belt around someone's neck and then that it broke and then he—he hit her with the hammer and then—then they took her into a—field—and he drug her out of the car and then he—he—. . . He said that he stabbed her and then he said that he 'fucked her.'" When Flores asked Morales why, he said, "Whatever my family wants me to do, I'll do it."

Raquel Cardenas also testified that Morales "told me how he killed her." He said Rick was driving, Terri was in the front passenger seat, and he was sitting behind her. He "tried to strangle her . . . with the belt and it broke so he hit her over the head . . . with a hammer" and "he just kept hitting her, then he dragged her out of the car" and "left her in the vineyard." Morales told Raquel "it took awhile," that Terri "was a tough girl," and that "she was screaming for Rick . . . to make him stop."

Randy Blythe (Terri Winchell's boyfriend, and also Rick Ortega's boyfriend) testified that around 8:30 that night, he got together with Rick Ortega in Ortega's car.

Rick performed a sex act on Randy. Randy testified that the car "smelled like ammonia."

The prosecution also presented testimony from a jailhouse informant, Bruce Samuelson. Like Pat Flores and Raquel Cardenas, Samuelson testified that Morales had told him he had killed Terri Winchell. Samuelson testified that, Morales told him that Morales and Rick Ortega arranged how to murder Terri Winchell, and that Rick had called him after he had picked Terri up. Morales told Samuelson that he had prepared for the murder by taking a belt, a knife, and a hammer. Morales, according to what he had told Samuelson, attempted to strangle Terri, the belt broke, he beat her head with a hammer, dragged her out of the car, raped her, and stabbed her to death.

When the police searched the house where Pat Flores and Mike Morales lived, they found Terri Winchell's purse. Christine Salaices, Rick Ortega's former girlfriend, identified the purse as belonging to Terri, as did Terri's best friend Glenda Chavez. The police also found blood in the floormats and all over the inside of Rick Ortega's car, and the broken belt under the mattress, which had blood on it consistent with Terri Winchell's blood type.

Raquel Cardenas testified that a year and a half after the murder, not long before the trial, Morales called her and told her to "get out of town some way so that [she would not] be handed a subpoena." Referring to her prior statement to the police, Morales told her that "he forgave [her] the first time but wouldn't forgive me the second time."

The jury convicted Morales of first degree murder with pre-meditation, found both special circumstances—intentional killing by torture and intentional killing by lying in wait—and returned a verdict for the death penalty.

C. Post-conviction Proceedings

The California Supreme Court affirmed Morales's conviction, and the United States Supreme Court denied certiorari.[1] Morales's conviction became final November 27, 1989. He subsequently petitioned the United States District Court for a writ of habeas corpus on July 20, 1992, and after 20 of his 52 claims were dismissed without prejudice as not exhausted, he went back to the state courts on a state habeas petition to exhaust them. The California Supreme Court denied his petition "on the merits and as untimely" on July 28, 1993.

Morales then amended his petition in the United States District Court. The district court considered the claims that the California Supreme Court had dismissed "on the merits and as untimely" as having been procedurally defaulted, but we reversed.[2] Our 1996 decision held that the California timeliness standards were too vague as applied to Morales's petition to furnish an adequate and independent state ground.[3] We therefore remanded for consideration of Morales's federal petition on the merits.

Back in district court, Morales moved for an evidentiary hearing on 39 of his 52 claims. That motion was denied, and ultimately Morales's petition was denied on the merits. So now, more than two decades after Terri Winchell was murdered, and after Morales was convicted by a jury in California Superior Court, lost his appeal in the California Supreme Court, was

---

**1.** *People v. Morales*, 48 Cal.3d 527, 257 Cal. Rptr. 64, 770 P.2d 244 (Cal.1989), *cert. denied, Morales v. California*, 493 U.S. 984, 110 S.Ct. 520, 107 L.Ed.2d 520 (1989).

**2.** *Morales v. Calderon*, 85 F.3d 1387, 1388 (9th Cir.1996).

**3.** *Id.* at 1390–91.

denied certiorari by the United States Supreme Court, lost his habeas case in the California Supreme Court, and lost his habeas case on the merits after some initial procedural skirmishing in the federal district court, we reexamine his case.

## Analysis

■■■ Morales's petition for writ of habeas corpus was filed before the effective date of the Antiterrorism and Effective Death Penalty Act[4] ("AEDPA") but his appeal was filed after that date. Under our en banc decision in *Mayfield v. Woodford,*[5] we therefore apply pre-AEDPA law to the merits of the petition and our standard of review,[6] but post-AEDPA law on the statutory requirement[7] for a certificate of appealability. A certificate of appealability, which may only be granted on an issue-by-issue basis,[8] may only issue if Morales makes a "substantial showing of the denial of a constitutional right."[9] Morales satisfies this standard by demonstrating "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."[10] On the merits, treating this as a pre-AEDPA petition, "[w]e presume that the state court's findings of historical fact are correct and defer to those findings 'in the absence of convincing evidence to the contrary' or a demonstrated lack of 'fair support in the record.' We review mixed questions of law and fact ... de novo. Finally, we review pure questions of law de novo."[11]

■■■ The certificate of appealability from the district court did not specify which issues could be appealed. We may not review the merits of Morales's appeal, however, unless we first determine with regard to each claim that Morales has made "a substantial showing of the denial of a constitutional right" that would justify issuing a certificate of appealability.[12] As we must issue a certificate of appealability on an issue-by-issue basis,[13] we treat the brief as requesting a certificate of appealability on all the issues presented, and grant it for: (1) improper jury instruction on the torture special circumstance; (2) unconstitutionality of the lying in wait special circumstance; (3) knowing use of false testimony of Raquel Cardenas; (4) use of a jailhouse informant (Samuelson) to evade Morales's right to counsel; (5) Confrontation Clause violation for Rick Ortega's remarks to Christine Salaices some months before the murder. We deny a certificate of appealability as to the remaining contentions and the undeveloped arguments suggested in footnotes.[14]

---

**4.** Pub.L. No. 104–132, April 24, 1996, 100 Stat. 1214.

**5.** 270 F.3d 915 (9th Cir.2001) (en banc).

**6.** *Id.* at 921 & n. 5 (citing *Slack v. McDaniel,* 529 U.S. 473, 481–82, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

**7.** *See* 28 U.S.C. § 2253 (2000).

**8.** *Morris v. Woodford,* 229 F.3d 775, 779 (9th Cir.2000).

**9.** 28 U.S.C. § 2253(c)(2).

**10.** *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003) (citation omitted) (quotation omitted).

**11.** *Mayfield,* 270 F.3d at 922 (citations omitted) (quoting 28 U.S.C. § 2254(d) (1994)).

**12.** 28 U.S.C. § 2253 (2000).

**13.** *Morris,* 229 F.3d at 779.

**14.** *See* 28 U.S.C. § 2253(c)(1). We also do not review Morales's challenges to various collateral rulings of the district court because he has not properly presented them in his brief. *See In re Lowenschuss,* 67 F.3d 1394, 1402 (9th Cir.1995) (deeming as waived inadequately raised issues); *International Olympic Committee v. San Francisco Arts & Athletics,* 781 F.2d 733, 739 (9th Cir.1986) (de-

## A. Torture Special Circumstance

The California statute governing death penalty procedures provides that, in the phase of the trial for determining whether the defendant is guilty of first degree murder, the trier of fact must "determine the truth of all special circumstances."[15] A finding of "one or more" special circumstances in California causes the murder to enter a penalty phase where the trier of fact determines whether to sentence the defendant to death or to life imprisonment without the possibility of parole.[16]

One of the special circumstances, which the jury in the case at bar found to be true, is that "the murder was intentional and involved the infliction of torture."[17] Morales argues that under a previous decision of ours, *Wade v. Calderon*,[18] he is entitled to have his petition granted because the jury instruction on this special circumstance was incorrect.

Morales's jury received two instructions regarding torture, one directed at torture as an element making the murder first degree, and the other directed at the special circumstance. Morales asserts that the torture special circumstance instruction erroneously omitted the intent requirement. The first degree murder instruction told the jury that torture requires an "intent to cause cruel pain and suffering" but it also told them that this "instruction does not apply to the special circumstance allegation of murder by torture."[19] The special circumstance instruction, on the other hand, told the jury that to find the torture special circumstance to be true, they had to find that "the murder involved the infliction of torture." The instruction did not require an intent to cause severe pain.[20]

We held in *Wade v. Calderon* that this same California torture special circumstance instruction violated the Eighth Amendment,[21] adopting the reasoning of the California Supreme Court decision in *People v. Davenport*.[22] In *Wade*, we concluded that, without a jury determination

---

clining to review an issue raised in a footnote and taking "the briefs as submitted" and limiting review "to the issues set forth in the briefs as required by Fed. R.App. P. 28(a)(2).").

15. Cal.Penal Code § 190.1.

16. *Id.* at §§ 190(b), 190.2(a).

17. *Id.* at § 190.2(a)(18).

18. 29 F.3d 1312 (9th Cir.1994).

19. The jury was instructed as follows on first degree torture murder:

> Murder which is perpetrated by torture is murder of the first degree. The essential elements of such murder are one, that the act or acts which caused the death must involve a high degree of probability of death; and two, *the defendant must commit such act or acts with intent to cause cruel pain and suffering* . . . .
> The crime of murder by torture *does not necessarily require any proof that the* . . . *deceased suffered pain.*

> *This instruction does not apply to the special circumstance allegation of murder by torture.* The elements required for that special circumstance allegation will appear later in these instructions.

(emphasis added).

20. The jury was instructed as follows on the torture special circumstance:

> To find that the special circumstance . . . [of] murder involving infliction of torture is true, each of the following facts must be proved. One, that the murder was intentional; and two, that the murder involved the infliction of torture.
> To prove the infliction of torture, *the infliction of extreme physical pain must be proved* no matter how long its duration.
> Awareness of pain by the deceased is not a necessary element of torture.

(emphasis added).

21. *Wade,* 29 F.3d at 1320.

22. 41 Cal.3d 247, 221 Cal.Rptr. 794, 710 P.2d 861 (1985).

that the defendant intended to torture, the distinction between murders where the victim did and did not feel extreme pain might "have nothing to do with the mental state or culpability of the defendant and would not seem to provide a principled basis for distinguishing capital murder from any other murder." [23] We accordingly directed the district court to issue the writ because we held, under the facts presented in *Wade*, that this error was not harmless.[24] We provided that no new sentence of death could be imposed without a new determination of special circumstances.

The case at bar is indistinguishable from *Wade*, as to the error regarding the instruction on the torture special circumstance. The next issue is whether, as in *Wade*, the writ must be granted unless a new sentence of death is imposed without the special circumstance.

 The State argues that because *Wade* came down in 1994, after Morales's conviction was final, it was a "new rule," so it could not be applied to Morales's case.[25] We reject this argument because the rule was not new. When Morales's direct appeals were pending, the California Supreme Court had already held in *Davenport*, the case quoted and in this respect followed by *Wade*, that the special circumstance instruction for torture had to require a finding of intent, or else it would allow arbitrary and capricious imposition of the death penalty in violation of the Eighth Amendment. On Morales's direct appeal, the California Supreme Court held that the torture special circumstance instruction was error.

 Following the California Supreme Court decision affirming Morales's convic-

tion,[26] the State also argues that the instructional error was harmless. The California Supreme Court concluded, and the State urges us to agree, that the jury necessarily found the requisite intent pursuant to its instruction on torture as an element in first degree murder. That contention is incorrect. The instructions allowed the jury to treat the murder as first degree on various grounds without finding an intent to torture, such as if it found premeditation and deliberation. The verdict does not establish that the jury found the element of torture as a basis for its first degree murder verdict.

 The State also argues that the closing arguments by counsel sufficiently educated the jury that intent was essential. We must presume, however, that the jury took the court's instructions as its authority on the law, and the instructions told the jury that intent is an element of torture as a basis for first degree murder but is not an element of the torture special circumstance. The instructions also informed the jury that the first degree murder torture element and the special circumstance of torture are different and one did not speak to the other. Thus, we cannot assume that the jury's finding of intent with respect to the first degree murder instruction necessarily means that the jury would have found intent with respect to special circumstances. Although the jury made a finding that Terri Winchell "was aware of extreme physical pain inflicted by said defendant," the jury did not make a finding that Morales intended to inflict it.

 In Morales's direct appeal, the California Supreme Court reasoned that the jury necessarily found as a matter of

---

**23.** *See Wade,* 29 F.3d at 1320 (citing *Davenport,* 221 Cal.Rptr. at 804, 710 P.2d 861).

**24.** *Id.* at 1322, 221 Cal.Rptr. 794, 710 P.2d 861.

**25.** *See Teague v. Lane,* 489 U.S. 288, 306–08, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**26.** *See People v. Morales,* 48 Cal.3d 527, 257 Cal.Rptr. 64, 770 P.2d 244 (1989).

logic an intention to inflict severe pain on Terri Winchell, because otherwise "there would have been no purpose in its special finding regarding the victim's awareness of the extreme physical pain." [27] We do not agree that the awareness of pain finding implies a jury determination on intent. There may have been no purpose in *instructing* the jury to make a finding about the victim's awareness of pain, without an instruction requiring intent, but the *jury's* purpose may have been merely to follow the instructions and fill in the answers to the questions provided to it.

The State also argues that the error was harmless because the jury also found true the lying in wait special circumstance. Morales argues that the lying in wait instruction was also unconstitutional, but as we explain below, we conclude that it was constitutionally permissible.

The analysis of the instructional error depends, under controlling law, on whether California is a weighing or a non-weighing state. [28] We have previously said in dictum that California is a weighing state under the current version of its death penalty statute. [29] If all the special circumstance of torture did was to move the case to a penalty phase, and the special circumstance was not weighed as such (though the evidence could be considered) at the penalty phase, then validity of the lying in wait special circumstance would make invalidity of the torture special circumstance harmless. [30] In a weighing state, on the other hand, we may not "assume it would have made no difference if the thumb had been removed from death's side of the scale." [31] Rather, "[w]hen the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence." [32]

We need not decide whether California is a weighing state to decide this case. Assuming *arguendo* that it is, harmless error analysis leads us to conclude that Morales is not entitled to relief.

We note first that, although the jury weighed an invalid special circumstance, the California Supreme Court could have cured the error and affirmed Morales's sentence in several ways. [33] First, the California Supreme Court could have found the error harmless under *Chapman v. California*. [34] Under *Chapman*, the state appellate court can affirm if it finds beyond a reasonable doubt that the same result would have been obtained without relying on the unconstitutional aggravating circumstance. [35] The California Supreme Court also could have cured the instructional error by "reweighing" aggravating and mitigating circumstances under *Clemons v. Mississippi*. [36]

---

**27.** *Id.* at 83–84.

**28.** *Stringer v. Black*, 503 U.S. 222, 229–30, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Williams v. Calderon*, 52 F.3d 1465, 1477 (9th Cir.1995); *Jeffers v. Lewis*, 38 F.3d 411, 414–15 (9th Cir.1994) (en banc).

**29.** *Silva v. Woodford*, 279 F.3d 825, 829 & n. 1 (9th Cir.2002).

**30.** *See Williams,* 52 F.3d at 1479.

**31.** *See Stringer,* 503 U.S. at 232, 112 S.Ct. 1130.

**32.** *Id.*

**33.** *See Valerio v. Crawford,* 306 F.3d 742, 756–57 (9th Cir.2002) (en banc).

**34.** 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**35.** *Valerio,* 306 F.3d at 756.

**36.** 494 U.S. 738, 748, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

Here, however the California Supreme Court simply asserted that the instructional error was harmless and did not engage in the analysis of the record necessary to conclude that the same result would have been obtained without relying on the torture special circumstance. Nor did the California Supreme Court perform any re-weighing of the factors the jury considered, excluding the torture special circumstance, because it concluded (mistakenly in our view) that the finding that the victim suffered severe pain logically implied that it had found intended torture. Under our en banc decision in *Valerio v. Crawford*, this was insufficient.[37]

We therefore have neither state appellate court reweighing nor harmless error analysis to which deference might be appropriate.[38] In the absence of the requisite "close appellate scrutiny" by the state courts reviewing Morales's sentence, we must conduct our own independent harmless error analysis.[39]

Ninth Circuit precedent requires us in this circumstance to apply *Brecht* harmless error review to the mistaken torture special circumstance instruction.[40] The torture special circumstance, for which the instruction was unconstitutionally erroneous, was among the factors the jury was to weigh, though it was no more than that. As we have already held this was error,

the state must provide us with a "fair assurance" that the error was harmless under *Brecht*.[41]

■■■ *Brecht v. Abrahamson* holds that where there is constitutional error but the review is collateral rather than direct, we should not apply the "harmless beyond a reasonable doubt" *Chapman*[42] standard, and should instead apply the "less onerous" *Kotteakos* standard.[43] Accordingly, the critical question is "whether, in light of the record as a whole," the error "had substantial and injurious effect or influence in determining the jury's verdict."[44] On collateral review, *Brecht* holds that a federal court cannot grant the writ based merely on a "reasonable possibility" that the constitutional error contributed to the verdict, but only where the petitioner "can establish that it resulted in actual prejudice."[45]

There are some cases where an instructional error like the one Morales suffered would be, as a matter of law, not harmless under *Brecht*. For instance, in *Wade*, the error was not harmless as a matter of law because our invalidation of the special circumstance eliminated the only remaining special circumstance.[46] Thus, our holding in *Wade* meant that the prisoner was no longer death penalty eligible under California law, so that the error was manifest-

---

37. *Valerio*, 306 F.3d at 756–60.

38. *Id.* at 757.

39. *Id.* at 761.

40. *See id.* at 762. *See also Wade*, 29 F.3d at 1322. Because Morales is a state prisoner seeking a writ of habeas corpus, we must apply *Brecht* harmless error analysis. *See Bains v. Cambra*, 204 F.3d 964, 976–77 (9th Cir.2000). That Morales's sentence is for death does not change this analysis. *See Valerio*, 306 F.3d at 762.

41. *Valerio*, 306 F.3d at 762 (citing *Gray v. Klauser*, 282 F.3d 633, 651 (9th Cir.2002)).

42. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

43. *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (referencing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

44. *Id.*

45. *Id.* at 637, 113 S.Ct. 1710.

46. As our opinion in *Wade* notes the other special circumstance Wade's jury found to be true was invalidated by the California Supreme Court. *See Wade*, 29 F.3d at 1322–23.

ly not harmless. But, in the case at bar, Morales, unlike Wade, remains death penalty eligible due to the validity of the lying in wait special circumstance. Thus, we must determine based on a close review of the record as a whole "whether the actual instruction had a substantial and injurious effect or influence on the jury's verdict." [47]

■ Applying the *Brecht* standard, we conclude, after thorough study of the record "as a whole," that the instructional error regarding the torture special circumstance did not have a "substantial and injurious effect or influence in determining the jury's verdict." The state's testimonial and physical evidence implicating Morales was overwhelming. There was no conflicting evidence regarding whether Morales murdered Terri Winchell, why he murdered her, or how he murdered her. And it was an entirely gratuitous and terribly vicious murder.

As in *Williams v. Calderon,* consideration of the torture special circumstance as such "adds only an improper label." [48] Because Terri Winchell took so long to die, not only was the abuse extreme, but Morales had a long time to repent, had he been morally so disposed, even during his acts of strangling, hammering and stabbing her. There is no reason to doubt on this record that the jury decided that Morales murdered her because he was Rick Ortega's cousin and Rick was angry at and jealous of her. There is no reason to doubt that the jury decided Morales helped trick her into the car, sat behind her planning to kill her after some practice with a belt and having brought a belt, hammer, and knife to do it with. There is no reason to doubt that after he failed to kill her by strangling her with the belt, he

beat her head in with a hammer, and when she still lived, dragged her out of the car, raped her, and stabbed her several times. Because we cannot, on this record, doubt that the jury so found, it would be unwarranted for us to think that it mattered to the jury whether Morales's conduct was labeled "torture special circumstance" by the California statute. To grant the writ under these circumstances would be to act on, at most, a "reasonable possibility" that the special circumstance label mattered to the verdict, and *Brecht* prohibits us from doing that.

The evidence was so overwhelming that the constitutional error cannot be said to have had an effect upon the verdict in the case at hand.[49] The jury could have decided that Morales initially intended to kill Terri Winchell quickly without much pain by strangling her. But the jury knew two things that would prevent them from ending their inquiry there. One was that he brought a hammer, which meant that he did not know if strangling would work, and intended to beat her head in if it did not. The second, unavoidable conclusion was that he kept going after strangling failed. Once she survived the strangling, the jury would have had to decide that he intended his subsequent conduct even though he saw as he performed it that she was surviving and suffering.

Given the factual record here, it is mere speculation that the absence of the torture special circumstance would have mattered to the jury. Mere speculation is insufficient to grant the writ under *Brecht,* because speculation does not give rise to a "grave doubt" whether the error had a substantial effect in determining the jury's verdict.[50] A harmless error analysis that

47. *Valerio,* 306 F.3d at 762.

48. *Williams,* 52 F.3d at 1477.

49. *Id.*

50. *See Coleman v. Calderon,* 210 F.3d 1047, 1051 (9th Cir.2000) (citing *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

would vacate the death sentence absent the jury "necessarily" finding the torture murder special circumstance is "far too strict" under *Brecht.*[51]

## B. Lying in wait Special Circumstances

■ The jury also found the special circumstance of lying in wait to be true. The instructions defined "lying in wait" as requiring three elements, "waiting, watching, and concealment" followed by immediate, surprise attack. The instructions further defined "concealment" as "ambush" or alternatively "creation of a situation where the victim is taken unawares even though he sees his murderer." The instructions given to the jury qualified this definition by explaining "it is only concealment which puts the defendant in a position of advantage from which it can be inferred that lying in wait was part of the defendant's plan to take his victim by surprise." A "perceptible interruption" between the "concealment and watchful waiting" and the period during which the killing took place would defeat the special circumstance.

Morales argues that California statutes regarding lying in wait murder,[52] as interpreted by the California Supreme Court, violates the Eighth Amendment. Morales claims that the California statutes in place during his trial failed to meaningfully distinguish lying in wait murder from other murder with pre-meditation and deliberation, and that there is an inadequate distinction between lying in wait as an aggravating factor and lying in wait as a special circumstance.[53]

Specifically, Morales argues that the California Supreme Court decisions regarding lying in wait are so expansive that the special circumstance violates the Eighth Amendment by failing to draw a meaningful distinction between lying in wait murders and any other murders with premeditation and deliberation. Morales's argument makes no reference to the actual instructions the jury was given or the evidence the jury heard in this case. Nor does Morales claim that the actual jury instructions failed to distinguish meaningfully between lying in wait and mere premeditation and deliberation. Without some connection between the claimed vagueness and what actually occurred in Morales's trial, we cannot say that the Eighth Amendment was violated in this case.

■ Further, the California lying in wait special circumstance is not unconstitutionally vague. Under the California statutes at the time of Morales's trial, murder committed "by means of" lying in wait is, by virtue of that aggravating factor, first degree murder.[54] Murder that is first degree, whether for that reason or another, committed in the "special circumstance" that the killing is "while" lying in wait subjects the defendant to a sentence of life without possibility of parole or death.[55] The "by means of" factor enhances the murder to first degree murder, and the "while" factor allows the first degree murderer to be death penalty eligible. Then the jury weighs the "while" factor, along with many others, to determine whether to impose the death penalty.

---

51. *See California v. Roy,* 519 U.S. 2, 4, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (per curiam).

52. "All murder which is perpetrated by means of ... lying in wait ... is first degree murder." Cal.Penal Code § 189.

53. *Compare* Cal.Penal Code § 189, *with* Cal.Penal Code § 190.2(a)(15) (1994) ("The defendant intentionally killed the victim while lying in wait.").

54. Cal.Penal Code § 189.

55. *See id.* §§ 190.1, 190.2(a)(15), 190.3.

Under *Godfrey v. Georgia*, for death penalty eligibility standards to satisfy the Eighth Amendment, such eligibility criteria must provide "a meaningful basis for distinguishing" the few cases in which the death penalty is imposed from the many in which it is not.[56] This requires the state to provide "clear and objective standards" that "channel the sentencer's discretion," obviating "standardless discretion."[57] If the standards are "so vague that they would fail" to channel discretion, then they allow "arbitrary and capricious sentencing" in violation of the Eighth Amendment.[58] The Court in *Tuilaepa v. California* rejected a broad challenge to the California scheme before us now, and limited applicability of the *Godfrey* requirements to death penalty eligibility as opposed to imposition.[59] In so doing the Court held that the *Godfrey* requirements are "not susceptible of mathematical precision" so "vagueness review is quite deferential."[60]

We held in *Houston v. Roe*[61] that the California "lying in wait" special circumstance is not unconstitutionally vague as an eligibility factor. Our holding in *Houston* was premised on the conclusion that California had "created a thin but meaningfully distinguishable line between first degree murder lying in wait and special circumstances lying in wait."[62] Indeed, the California lying in wait special circumstance does not apply to every convicted murderer, or even every convicted first degree murderer. Under California law, a person can commit first degree murder intentionally, through a variety of means. But to prove the special circumstance of lying in wait, the government must prove intentional murder plus the three elements of lying in wait.

Because *Houston* was not a death penalty case, we did not reach the question whether the statute was specific enough for what the Court in *Tuilaepa* calls a "selection" criterion after eligibility is established. But because *Tuilaepa* holds that selection criteria are less constrained by specificity requirements than eligibility criteria, it follows *a fortiori* from *Houston* that the California special circumstance of lying in wait is sufficiently specific as a death penalty selection factor. Thus, Morales's Eighth Amendment challenge to lying in wait as an eligibility and selection criterion fails under *Houston*.

## C. Knowing Use of Perjury

■ Morales argues that he was denied due process of law by the government's knowing use of perjured testimony by Raquel Cardenas to obtain his conviction. The government's knowing use of perjured testimony to obtain a conviction violates a defendant's right to due process of law.[63]

■ In 1994, over a decade after the trial, Raquel Cardenas signed an affidavit for Morales saying that she had lied in her trial testimony. Specifically, she stated that she lied when she testified that Morales told her that he had murdered Terri Winchell, that he told her how he committed the murder, and that she saw blood in the car. Though Raquel's recantation, if true, undermines some of her testimony it

---

**56.** *Godfrey v. Georgia*, 446 U.S. 420, 427–28, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

**57.** *Id.* at 428, 100 S.Ct. 1759.

**58.** *Id.*

**59.** *Tuilaepa v. California*, 512 U.S. 967, 972–73, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

**60.** *Id.* at 973, 114 S.Ct. 2630.

**61.** 177 F.3d 901, 907 (9th Cir.1999).

**62.** *Id.*

**63.** *United States v. LaPage*, 231 F.3d 488, 491 (9th Cir.2000).

would not undermine all of it. Nor does her affidavit demonstrate that the prosecution knew that she was lying during her testimony at trial.[64]

The due process requirement voids a conviction where the false evidence is "known to be such by representatives of the State."[65] The essence of the due process violation is misconduct by the government, not merely perjury by a witness.[66] Morales, however, sets out no factual basis for attributing any misconduct, any knowing presentation of perjury, by the government. Thus there is no basis for granting the writ even if Raquel Cardenas did lie. That a witness says some years later that she lied at trial does not furnish a basis for granting the writ on account of the state's *knowing* use of perjury (though, of course, it may on other grounds not urged here, such as when the new evidence demonstrates actual innocence).

 No evidentiary hearing is necessary with respect to the purported perjury claim. An evidentiary hearing is unnecessary because Raquel's allegation that she perjured herself, even if proved, would not entitle Morales to relief.[67] At most, Morales is able to show that Raquel perjured herself in part, but makes no colorable showing of knowing use of perjured testimony. Given the evidentiary submissions by Morales, the district court did not abuse its discretion in denying an eviden-tiary hearing on whether the government knowingly presented perjured testimony.

### D. The Jailhouse Informant

Morales argues that the government put another prisoner, Bruce Samuelson, in a cell diagonally opposite to his in segregation, and offered him leniency, in order to have Samuelson extract a confession from Morales. He argues that he is entitled to the writ under *Massiah v. United States*[68] and *United States v. Henry*[69] because this interfered with his right to counsel.

 In support of his motion for an evidentiary hearing, Morales submitted as evidence an interview that an assistant attorney general and his investigator had with Samuelson in 1993, eleven years after the trial, as the attorney general's office prepared for one of the habeas proceedings. But this evidence doesn't raise a colorable claim. Samuelson does not say that he was put into Morales's cell to extract admissions from Morales. To the contrary, Samuelson says that before or during the trial an "insinuation" was made to that effect, but it was "not the case at all." Samuelson states that the reason he was put in segregation was that he asked to be put there, so that he could avoid contact with the general prison population and have his own room where his things would be safe from theft. He got to talk-

---

**64.** In the recantation affidavit, Raquel Cardenas says that Morales returned to the apartment "all riled up" after about an hour, "threw a purse at me," and exclaimed that "the damn belt broke." Though Raquel says she felt pressured when she made her statement to the police and when she testified, Raquel says nothing whatsoever in her recantation affidavit to suggest that the police or the prosecution knew she was lying.

**65.** *Id.* (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)).

**66.** *Id.* at 491–92.

**67.** *Rich v. Calderon,* 187 F.3d 1064, 1068 (9th Cir.1999).

**68.** 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

**69.** 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

ing with Morales because he was impressed with Morales's work as an artist.

Morales argues that Samuelson is demonstrably lying about this, because Samuelson says they spoke in Spanish, and Morales does not speak Spanish. But whether Samuelson is lying in his 1993 interview is not the question. Morales presents no evidence to demonstrate that the state planted Samuelson near him to get him to talk outside the presence of his attorney. On this record, the district court did not abuse its discretion in denying an evidentiary hearing on whether the state planted Samuelson.[70] That Samuelson bargained with what he had—information—for what he wanted—lenience—does not support an inference that he was planted to get such information.

### E. Confrontation Clause

 Morales argues that his constitutional right to confront witnesses against him was violated when the trial court allowed hearsay testimony from Rick Ortega's former girlfriend Christine Salaices. Christine testified that Rick had told her some months before the murder that Rick planned to stab Terri Winchell, and would bring Morales with him because "Mikey wouldn't let him stop." We need not decide whether allowing in this testimony violated the Confrontation Clause, because, even assuming that it did, that error would be harmless. Under *Brecht* the writ cannot be granted for constitutional trial error where, as here, the erroneously admitted testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict."[71]

AFFIRMED.

---

70. *See Rich,* 187 F.3d at 1068.

71. *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710.